UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| JAMES ARTHUR CLAMPITT, | ) | Case No. 11-20011-659 |
| | ) | Judge Kathy A. Surratt-States |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ASHLEY COBB, ET. AL., | ) | **Adversary No. 11-2010-659** |
| | ) | |
| | ) | **PUBLISHED** |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| JAMES ARTHUR CLAMPITT, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The matter before the Court is the Complaint to Determine the Dischargeability of a Particular Debt Pursuant to 11 U.S.C. § 523 filed by Plaintiffs Ashley Cobb, by and through her next friend Jan Cobb, Marci Cobb and Gemma Carroll and Answer to Complaint to Determine the Dischargeability of a Particular Debt Pursuant to 11 U.S.C. § 523 filed by Defendant James Arthur Clampitt. On November 13, 2012, this Court denied Defendant James Arthur Clampitt's Motion for Summary Judgment. On December 3, 2012, this Court held a telephonic conference and granted Plaintiffs' Oral Motion to Permit Deposition Testimony to be Offered into Evidence at Trial.[1] A trial

---

[1]Plaintiffs argued that it was difficult to accurately calculate the "straight line distance" for each deposed witness and that it is an over 110 mile drive from the scene of the accident to the court house where this Court is located. Therefore, Plaintiffs argued that it was reasonable to conclude that the witnesses were more than 100 miles from the place of trial and therefore unavailable pursuant to Federal Rule of Civil Procedure 32(a)(4)(B). Defendant did not present any calculations to refute Plaintiffs' argument. Therefore, the Court ruled that the witnesses were unavailable for trial and that their depositions could be offered during trial in accordance with Federal Rule of Civil Procedure 32(a)(4)(B). At trial, Defendant renewed his objection to the admission of all depositions pursuant to Federal Rule of Civil Procedure 32(b), however, those objections were overruled on the same basis in that Defendant did not

was held on December 4, 2012, at which Plaintiffs appeared by counsel and Defendant appeared in person and by counsel.  Argument was presented, exhibits were admitted,[2] testimony was presented[3] and the matter was taken under submission.  Upon consideration of the record as a whole, the Court issues the following **FINDINGS OF FACT**:

Defendant James Arthur Clampitt (hereinafter "Defendant") filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code on January 18, 2011.  Defendant is a 41 year old attorney licensed to practice law in the State of Missouri.  He is approximately 5'10" and 235 lbs.  On June 13, 2010, Defendant weighed over 260 lbs.  Defendant has represented clients in several Driving While Intoxicated (hereinafter "DWI") matters in the past and testified that he has received DWI training that he has used in defense of his clients.  Defendant testified that in his career, he has handled between 50 and 100 DWI cases.

On July 8, 2011, Plaintiffs Ashley Cobb, by and through her Next Friend, Jan Cobb, Marci Cobb and Gemma Carrol (hereinafter "Plaintiffs") filed the Complaint seeking to except any debt owed by Defendant for the wrongful death of Richard Cobb (hereinafter "Decedent") pursuant to Section 523(a)(6) or (a)(9).  Plaintiff Ashley Cobb is Decedent's 14 year old daughter, Jan Cobb is a relative of Decedent, Marci Cobb is the Decedent's wife of only five (5) weeks and Gemma Carrol is Decedent's mother.  Decedent is also survived by his 15 year old son Matthew Cobb.

At approximately 4:30 p.m. on June 13, 2010, Defendant and Ms. Angela Bagley (hereinafter "Ms. Bagley"), Defendant's fiancé at the time of trial, went to see a movie which lasted

---

provide this Court with any distance calculations to refute Plaintiffs' position.

[2]Specifically, Plaintiffs' Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31 were admitted.  Plaintiffs' Exhibit 7 consist of three (3) photographs.  A portion of the first two (2) photographs – located directly under the speed limit sign – was redacted on Defendant's oral motion due to undue prejudice.  Plaintiffs' Exhibit 12 was not admitted because Defendant stipulated on the record that Defendant's text messages are recorded by Defendant's mobile phone provider, U.S. Cellular, in Eastern Time rather than Central Time where the events precipitating this trial took place.

[3]Plaintiffs rested after the admission of Plaintiffs' Exhibits. Only Defendant presented live testimony.

approximately two (2) hours.  After the movie, Defendant and Ms. Bagley went to Dos Arcos, a

Mexican Restaurant in Mexico, Missouri.  Both Defendant and Ms. Bagley ordered some food[4] and

two alcoholic drinks each.  Defendant consumed a large, 32 ounce double rum and coke and

approximately half of his second drink, a small, single rum and coke.  There is no dispute that the

bartenders at Dos Arcos do not measure the amount of alcohol put in each drink, rather, the alcohol

is free-poured until the drinks are "strong enough."[5]  There is no evidence as to the brand or proof

of the rum used to make Defendant's rum and coke drinks at Dos Arcos, nor is there evidence of

whether the rum used was dark, gold, or light (white or clear) rum.

While at Dos Arcos, Defendant sent numerous text messages.  A few of those text

messages were sent to and received by Ms. Sarah Gleeson (hereinafter "Ms. Gleeson").  Ms.

Gleeson was at Dos Arcos during a portion of the time that Defendant was there with Ms. Bagley

but Ms. Gleeson did not dine with Defendant and Ms. Bagley.  Defendant and Ms. Gleeson got into

an altercation-of-sorts via text message.[6]  At approximately 8:34 p.m., Defendant sent Ms. Gleeson

a text saying "Not sure...Drunk & sad."[7]  Based on the tone of the text messages between

Defendant and Ms. Gleeson, it appears that Defendant's "Not sure...Drunk & sad" text was in

---

[4]It appears that according to Ms. Bagley, she and Defendant ordered the following: a $3.99 chalupa special with chicken (no guacamole), a $5.50 steak and mushroom quesadilla in queso dip, two small margaritas at $3.75 each, one sweet tea at $1.45, a large 32 ounce rum and coke at $7.99 and a small rum and coke at an unknown price. Detective Carl Fuenfhausen attempted to recreate Ms. Bagley and Defendant's bill by reconciling Ms. Bagley's recollection of what was ordered with the Dos Arcos menu.  If Defendant was billed for the above, Defendant's bill was $5.32 less than it should have been according to Detective Fuenfhausen's calculations.   See Pl. Ex. 1, at 69.  The itemized bill was never recovered because management at Dos Arcos does not maintain the itemized bills once they are paid; Dos Arcos' management only maintains records of the total of each bill. See Pl. Ex. 1, at 43.

[5]See Pl. Ex. 1, at 69.

[6]Ms. Gleeson is a paramour of Defendant.  Their sexual relationship began sometime in 2009 and continued on-and-off for approximately three (3) years, until the Summer of 2012.  Ms. Gleeson is married with three children, and was married at the time of her relationship with Defendant. Defendant and Ms. Gleeson have known each other since middle school. See Gleeson Dep. 6:18-21, 7:9-19, 8:16-9:8, September 28, 2012, Pl. Ex. 18.

[7]Pl. Ex. 4, at 7.

response to Ms. Gleeson's inquiry to Defendant as to the reason for some of the comments made in Defendant's previous text messages that evening.   However, Defendant testified that he sent the "Not sure...Drunk & sad" text because he was not feeling good about his choices and was trying to distance himself from Ms. Gleeson despite her aggressive pursuit of him.  As such, Defendant testified that his "Not sure...Drunk & sad" text was sent in effort to get Ms. Gleeson to "back-off" and to let her know he was not in the mood to talk.

Defendant received the bill for his and Ms. Bagley's meal at approximately 9:09 p.m. Defendant and Ms. Bagley departed Dos Arcos after Defendant paid the bill by credit card and then proceeded to Ms. Bagley's home in Defendant's 2007 Chevrolet Suburban, a full-size Sports Utility Vehcile (hereinafter "SUV").  At approximately 9:15 p.m., Defendant received a text message from Ms. Gleeson asking Defendant to return to Dos Arcos to talk to her.[8]  Defendant dropped Ms. Bagley off at her home and then sought to return to Dos Arcos to meet Ms. Gleeson.

On route to Dos Arcos, Defendant drove on North Jefferson Street in Mexico, Missouri.  At approximately 9:30 p.m., Decedent was operating a riding lawnmower in the 800 block of North Jefferson Street in Mexico, Missouri.[9]  That portion of North Jefferson Street is in a residential area and is a straight and flat strip of road. The sun had just set, the roads were dry and visibility was clear.  Decedent and Defendant were both driving in the same direction, south-bound, on North Jefferson.  Decedent noticed Defendant and waived his hands as if to try to get Defendant to notice him.[10]  Decedent was wearing dark colored clothing.  The riding lawnmower did not have reflectors or taillights.[11]

---

[8]Pl. Ex. 4, at 7.

[9]Decedent was on route to his friend John Powell aka Weeder's house because he was upset because he thought the Mexico Department of Public Safety was taking pictures of him as part of an investigation concerning a burglary in which Decedent was a suspect. See Pl. Ex. 1, at 51.

[10]Hoffman Dep. 6:22-7:6, September 28, 2012, Pl. Ex. 19; see also Pl. Ex. 10.

[11]Prelim. Hr'g Tr. 29:8-19, Pl. Ex. 3 (testimony of Detective Fuenfhausen).

4

Defendant struck the riding lawnmower while Decedent was operating it. There is no evidence that Defendant applied his brakes before the crash occurred. The impact of the SUV and the riding lawnmower caused the riding lawnmower to be pushed back at least 31 feet and 10 inches.[12] Defendant momentarily slowed down after the impact, then Defendant continued driving.

Decedent was responsive on the scene and became considerably combative with the Emergency Medical Technicians (EMTs).[13] Decedent was ultimately restrained, sedated by intravenous medication, possibly intubated,[14] transported to Audrain Medical Center and air lifted to University Hospital.[15]

The airbags in the SUV did not activate at any time due to the impact with the riding lawnmower.[16] The SUV did sustain considerable damage in that the metal radiator support was bent and there was damage to the front bumper and headlight assembly.

The loud crash caused numerous residents to exit from their homes. One witness testified that he heard a riding lawnmower, then he heard a crash that was quite loud – loud enough to overpower the fans and tv in his home – then he no longer heard the riding lawnmower.[17] One witness thought the loud noise was someone crashing into her garage.[18] Detective Carl Fuenfhausen (hereinafter "Detective Fuenfhausen") arrived on the scene and conducted an

---

[12] Pl. Ex. 1, at 3; Prelim. Hr'g Tr. 20:24- 21:2, Pl. Ex. 3.

[13] Pl. Ex. 1, at 93.

[14] Of all the statements provided by the EMTs, only one says that the EMS personnel tried to intubate Decedent. See Pl. Ex. 1, at 93.

[15] Pl. Ex. 1, at 93-95, 98.

[16] Pl. Ex. 1, at 61 (Trooper Mallery of the Mexico Department of Public Safety's investigation revealed that impact with the riding lawnmower was insufficient to significantly change the velocity of the SUV because of the drastic difference in the mass of the SUV versus the riding lawnmower. As such, the crash was not that severe for the SUV but very severe for the riding lawnmower).

[17] Raynor Dep. 6:5-19, September 28, 2012, Pl. Ex.23; see also Pl. Ex. 9.

[18] Phillips Dep. 7:17-19, September 28, 2012, Pl. Ex. 22.

investigation of the crash, which included collecting witness statements and amassing evidence found at the scene of the crash to the inclusion of debris and broken pieces from the SUV.

Defendant arrived at Dos Arcos and Ms. Gleeson was sitting on the tailgate of her friend Christine Mahler's truck. Christine Mahler and Mike Finch were also sitting on the tailgate of the truck. Defendant pulled up such that the passenger side of the SUV was closest to the tailgate of Christine Mahler's truck, however, Defendant stopped the SUV such that the front was past where Ms. Gleeson, Christie Mahler and Mike Finch were seated. Defendant remained in the SUV. Ms. Gleeson spoke to Defendant first through the passenger-side window and then through the driver-side window.[19] Ms. Gleeson did not notice any damage to the SUV.[20] Christine Mahler and Mike Finch also denied noticing any damage to the SUV, though they further stated that they were not paying much attention because they were talking.[21]

In an interview held on July 7, 2010, Ms. Gleeson informed Detective Fuenfhausen that the amount of alcohol in the drinks at Dos Arcos "differs" from time to time.[22] Ms. Gleeson further stated that when she was talking to Defendant outside of Dos Arcos through the SUV windows, Defendant appeared to be "normal" and that she did not believe he was intoxicated. When Defendant Fuenfhausen reminded Ms. Gleeson of the aforementioned "Not sure...Drunk & sad" text message that was sent by Defendant to her, Ms. Gleeson then stated that Defendant was not "drunk drunk."[23] When deposed, Ms. Gleeson stated that she did not "remember using those words."[24]

---

[19]Pl. Ex. 1, at 85, 90.

[20]Pl. Ex. 1, at 78.

[21]Pl. Ex. 1, at 85, 90.

[22]Pl. Ex. 1, at 77.

[23]Pl. Ex. 1, at 78.

[24]Gleeson Dep. 23:15-18, Pl. Ex. 18.

Defendant left Dos Arcos and returned home to retrieve his daughter Abigail Clampitt's (hereinafter "Abigail") laptop. Abigail resides with her mother, Defendant's ex-wife. Abigail asked Defendant to bring her the laptop via text message sent at approximately 9:23 p.m. that evening.[25] Though Defendant initially indicated that he would bring Abigail the laptop the following day,[26] Defendant arrived at Abigail's home with the laptop at approximately 10:12 p.m.[27] Abigail testified that when she saw Defendant that night, he did not appear intoxicated nor did she smell an odor of alcohol while he was in her presence. Neither Abigail nor her mother observed the SUV at any point during Defendant's visit.[28]

Defendant then proceeded to Rebecca Lottinville's (hereinafter "Ms. Lottinville") house and arrived at approximately 10:25 p.m.[29] Defendant stayed at Ms. Lottinville's house for approximately 45 minutes[30] then he left. Ms. Lottinville did not observe Defendant arrive or depart and therefore had no occasion to observe the condition of the SUV. In an interview conducted by Detective Fuenfhausen, Ms. Lottinville stated that she did not smell alcohol on Defendant's breath and that Defendant seemed "normal."[31]

At approximately 6:26 a.m. on June 14, 2010, Defendant sent the following text message: "Very hung over my friend ... Not gonna make it ... Very sorry"[32] to a number ending in 9859.

---

[25] Pl. Ex. 4, at 8.

[26] Pl. Ex. 4, at 9.

[27] Pl. Ex. 4, at 15.

[28] Pl. Ex. 1, at 52.

[29] Pl. Ex. 1, at 72.

[30] At that time, Defendant and Ms. Lottinville had an intimate relationship. At times, Defendant has loaned Ms. Lottinville money to pay her utilities. See Lottinville Dep. 11:5-15, September 28, 2012, Pl. Ex. 20.

[31] Pl. Ex. 1, at 72.

[32] Pl. Ex. 5.

Defendant testified that this text message was intended for a waiter named Mario at Dos Arcos whom he agreed to meet at the YMCA that morning.  Defendant denies that he was in fact hung over, but rather, Defendant testified that he sent that text message because "Mario could relate to that."  On July 8, 2010, Detective Fuenfhausen called the number ending in 9859, however it was no longer a working number.[33]  Detective Fuenfhausen was ultimately able to contact Mario Garcia (hereinafter "Mr. Garcia") who stated that he once operated the phone number ending in 9859 and that his new number ended in 9805.  Mr. Garcia stated that he was employed as a waiter at Dos Arcos and that he and Defendant had a work-out date at the gym set for a date that Mr. Garcia could not recall, however, Defendant did not show up.  Mr. Garcia also stated that Defendant contacted him by text message and asked to be informed if anyone asked questions about Defendant at Dos Arcos.[34]

Defendant brought the SUV to be repaired by Pearl Motor Company between 7:30 and 8:00 a.m. on June 14, 2010.  Defendant informed Pearl Motor Company that the damage was caused when his daughter was driving with Defendant in the SUV.[35]  At approximately 1:00 p.m., Detective Fuenfhausen contacted Pearl Motor Company to inform them to be on the look-out for a silver SUV with front-end damage.[36]  Detective Fuenfhausen was then informed that Defendant brought the SUV in to be repaired that morning and that the vehicle had since been driven by a Pearl Motor Company employee to Randy's Auto Body shop for repairs.[37]  Detective Fuenfhausen arrived at Randy's Auto Body shop at 1:26 p.m. and was able to match the broken pieces and debris collected

---

[33]Pl. Ex. 1, at 87.

[34]Pl. Ex. 1, at 87-88.

[35]Pl. Ex. 1, at 33.

[36]Pl. Ex. 1, at 33.

[37]Pl. Ex. 1, at 33.

8

at the scene of the crash to the damage on Defendant's SUV.[38] Defendant's neighbor and insurance adjuster for American Family Insurance,[39] Thomas Greenwell (hereinafter "Mr. Greenwell"), was informed of the damage by an employee at Randy's Auto Body shop[40] and arrived to take pictures of the damage.[41]

Detective Fuenfhausen immediately proceeded to Defendant's law office. Defendant denied being in the area of the accident.[42] Defendant further indicated to Detective Fuenfhausen that he was "not going to play games" nor was he "going to tell [Detective Fuenfhausen what he] wanted to hear."[43] The interview ended at that time. Detective Fuenfhausen attempted to make other contact with Defendant to no avail.

On June 16, 2010 at 10:50 p.m., Decedent died at University Hospital. Doctor Edward H. Adelstein prepared a Toxicology Lab Report in which he concluded that Decedent's cause of death was "blunt force trauma to the head, chest and abdomen causing rupture of the small intestine resulting in sepsis with peritonitis. These injuries are the result of being struck by a motor vehicle."[44] The Toxicology Lab Report was provided to the Mexico Department of Public Safety on July 29, 2010.

On July 2, 2010, Defendant faxed an Affidavit to the Mexico Department of Public Safety in which Defendant essentially states that he was momentarily distracted by his phone while he was

---

[38]Pl. Ex. 1, at 33.

[39]Pl. Ex. 1, at 39.

[40]Pl. Ex. 1, at 39.

[41]Pl. Ex. 1, at 34.

[42]Pl. Ex. 1, at 25; Fuenfhausen Dep. 12: 3-13, September 28, 2012, Pl. Ex. 17.

[43]Pl. Ex. 1, at 25; Fuenfhausen Dep. 12: 3-13, Pl. Ex. 17.

[44]Pl. Ex. 1, at 101.

driving on North Jefferson, at which time his vehicle "felt like it struck the curb of the street."[45]
Defendant states that he did not notice anything in the road when he looked in his rear-view mirror
and he did not feel his vehicle scraping or dragging as such, he continued driving.  Defendant's
affidavit further stated that his windows were up, the radio was on and the air conditioning was
blowing.[46]  Defendant testified that he was blaring Nickelback[47] in the cab of the SUV and that he
did not hear the crash beyond the sound that lead Defendant to believe he curbed a tire.

Defendant testified that from 2006 through 2011, he had a prescription for Lexapro
(Escitalopram).  Lexapro is an anti-depression and anti-anxiety medication.[48] Lexapro may affect
motor and mental skills and may cause drowsiness.[49]  Those taking Lexapro are advised not to
drive or operate heavy machinery until its effects are known and to avoid alcohol while taking
Lexapro because use of alcohol can worsen the above described side-effects.[50] Defendant testified
that he cannot recall whether he was actually taking Lexapro on or about June 13, 2010 nor can
he recall whether he took Lexapro on June 13, 2010.  Defendant admits that he was well aware of
the side effects of Lexapro but does not believe he experienced any side effects when he was
taking the medication.

Not a single witness interviewed or deposed indicated that they saw Defendant appear
intoxicated, to the inclusion of Ms. Bagley who was with Defendant at Dos Arcos when he
consumed the rum and coke drinks.  Because Defendant left the scene of the crash, no Blood

---

[45]Clampitt Aff. ¶ 8 (included as Plaintiffs' Exhibit 6 during Defendant's deposition); see also Pl. Ex.
1, at 73-75.

[46]Pl. Ex. 1, at 73-75.

[47]Nickelback is a Canadian hard-rock band.

[48]Pl. Ex. 31.

[49]Pl. Ex. 31.

[50]Pl. Ex. 31.

Alcohol Content Test (hereinafter "BAC Test") or other chemical analysis was ever conducted.  As a result of this collision involving Decedent, Defendant was charged and indicted with a Class B Felony of Involuntary Manslaughter in the First Degree, Class C Felony of Involuntary Manslaughter in the First Degree and Class D Felony of Leaving the Scene of a Motor Vehicle Accident.[51] Ultimately, the State of Missouri only brought the Class C Felony of Involuntary Manslaughter in the First Degree under Missouri Statute Section 565.024 and the Class D Felony of Leaving the Scene of a Motor Vehicle Accident under Missouri Statute Section 577.060 to trial.

Defendant submitted his responses to Plaintiffs' interrogatories, requests for production of documents and requests for admissions on March 30, 2012 and in many instances, invoked his Fifth Amendment privilege and refused to answer.  Plaintiffs thereafter conducted several witness depositions and on November 1, 2012, deposed Defendant at which time, Defendant answered several questions to which he previously invoked the Fifth Amendment.  On November 27, 2012, the eve of this December 4, 2012 trial, Defendant submitted amended responses to Plaintiffs' interrogatories, requests for production of documents and requests for admissions.

Plaintiffs argue that they are entitled to an adverse inference where Defendant previously asserted the Fifth Amendment because Plaintiffs argue that Defendant is using the Fifth Amendment as a sword not a shield.  Plaintiffs argue that Defendant was only willing to be deposed and appropriately respond to Plaintiffs' discovery requests once Defendant knew the deposition testimony of the other witnesses and such, Defendant could craft his testimony.  Next, Plaintiffs argue that in any scenario presented by Defendant, there is sufficient evidence to determine that Defendant was intoxicated when he struck Decedent after drinking an amount equivalent to five (5) alcoholic beverages: either Defendant was too drunk from the use of alcohol or too high from the use of Lexipro, or both, to realize his actions or care; Defendant was aware of his actions so he fled

---

[51]Pl. Ex. 25.

the scene because he did not want any witnesses; or Defendant was intoxicated but through his DWI experience, Defendant knew that if he stopped, he ran the risk of a chemical analysis being conducted and therefore he fled the scene of the crash.   Plaintiffs argue that the evidence presented is sufficient to meet the required standards.

Defendant argues that in order for Plaintiffs to obtain a negative inference, there must be a prima facie finding that the inference is proper and the circumstances for such a finding do not exist.  Defendant further argues that there are no witnesses of intoxication and as such, Plaintiffs cannot meet the required standard to except a debt from discharge pursuant to Section 523(a)(9). Further, there is no evidence of any wilful or malicious intent against Decedent in that Defendant had never met Decedent as such, Plaintiffs cannot meet the required standard to except a debt from discharge pursuant to Section 523(a)(6).

## JURISDICTION

This Court has jurisdiction of this matter pursuant 28 U.S.C. §§ 151, 157 and 1334 (2011) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (2011).  Venue is proper in this District under 28 U.S.C. § 1409(a) (2011).

## CONCLUSIONS OF LAW

The parties raised preliminary matters which the Court will address at this time.   The first such matter is whether this Court should draw a negative inference from Defendant's sporadic invocation of the Fifth Amendment during discovery.  The second matter is whether some of the questions posed to Ms. Bagley and Ms. Gleeson during their depositions were proper.  The Court will address each matter in turn.

Defendant's Invocation of the Fifth Amendment

Defendant submitted his responses to Plaintiffs' interrogatories, requests for production of documents and requests for admissions on March 30, 2012.   Defendant invoked his Fifth

12

Amendment privilege in response to several of Plaintiffs' requests.   After Plaintiffs deposed numerous witnesses, Defendant changed his position and on November 1, 2012, answered several questions during his deposition that Defendant previously refused to answer by invoking his Fifth Amendment privilege.   Plaintiffs assert that grounds exist for this Court to strike Defendant's amended discovery responses, strike his testimony during trial and adopt a negative inference where Defendant invoked the Fifth Amendment in his March 30, 2012 discovery responses.

In a civil proceeding, it is permissible, not mandatory, for the trial court to draw a negative inference from a party's invocation of the Fifth Amendment.  *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976); *In re Carp,* 340 F.3d 15, 23 (1st Cir. 2003) (citing *Mulero-Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 678 (1st Cir.1996)).  Ultimately, the trial court must determine whether a party's actions warrant a negative inference. *In re Carp,* 340 F.3d at 23.

Here, the Court concludes that while Defendant certainly used the Fifth Amendment as a sword, Plaintiffs were nonetheless able to present their evidence.  Plaintiffs were able to depose the witnesses they sought to depose.   The testimony of the witnesses who have personal relationships with Defendant was not likely going to be different from that which was ultimately given.   Defendant's testimony was in large part consistent with the affidavit he provided to the Mexico Department of Public Safety on July 2, 2010.   Defendant's discovery responses and deposition testimony ultimately speak to Defendant's credibility and as such, this Court will not draw a negative inference where Defendant initially invoked the Fifth Amendment.  So too, the Court will not strike Defendant's testimony for the same reason.

Ms. Bagley's September 28, 2012 and November 1, 2012 Depositions and Ms. Lottinville's September 28, 2012 Deposition

Upon the admission of Ms. Bagley's September 28, 2012 Deposition, Plaintiffs' Exhibit 13, Ms. Bagley's November 1, 2012 Deposition, Plaintiffs' Exhibit 14, and Ms. Lottinville's September 28, 2012 Deposition, Plaintiffs' Exhibit 20, Defendant requested that this Court rule on the

objections raised by counsel for Defendant during those depositions.  Counsel for Defendant had

no basis to make any objection during those three depositions because counsel for Defendant only

represents Defendant; counsel for Defendant does not represent Ms. Bagley or Ms. Lottinville.  Ms.

Bagley was not represented by counsel during her depositions.  Neither was Ms. Lottinville.  Neither

Ms. Bagley nor Ms. Lottinville at any point objected to any of the questions posed by Plaintiffs'

counsel.  Rather, during Ms. Bagley's September 28, 2012, counsel for Defendant objected to

questions and thereafter made a leading statement of why he did not want Ms. Bagley to answer.

When counsel for Plaintiffs would instruct Ms. Bagley to answer, she would refuse.[52]  As such,

because counsel for Defendant had no basis to make any objection, all objections made by counsel

for Defendant during Ms. Bagley and Ms. Lottinville's depositions are consequently overruled.   In

any event, the objections were improper because any statement made by Defendant is not hearsay

pursuant to Federal Rule of Evidence 801(d)(2)(A), no statement made by Defendant to Ms. Bagley

is privileged and so too, any statement made by Defendant to his counsel in the presence of Ms.

Bagley is not privileged as to Ms. Bagley.  The aforementioned depositions stand as transcribed,

are relevant and probative to these proceedings and the Court will herein ascribe the appropriate

weight.

Section 523(a)(9)

        To except a debt from discharge under Section 523(a)(9), a creditor must prove the

following:

> (1) there is a death or personal injury;
> (2) the death or personal injury was caused by the debtor's unlawful

---

[52]Ultimately, this Court held a telephonic conference on October 12, 2012 in which this Court granted Plaintiffs' Motion to Compel Angela Bagley to Answer Deposition Questions and to Recover Fees and Expenses.  Specifically, upon the direct or indirect instruction of counsel for Defendant, Ms. Bagley refused to answer questions concerning conversations she had with Defendant about the events of June 13, 2010 and Decedent and conversations she overheard between Defendant and others about the events of June 13, 2010 and Decedent.  Counsel for Defendant also raised general objections such as attorney/client privilege based upon the claim that Ms. Bagley was an employee of Defendant as well as hearsay objections.

> operation of a motor vehicle;
>
> (3) the operation of the motor vehicle was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance.

11 U.S.C. § 523(a)(9) (2011); *In re Pair,* 264 B.R. 680, 684 (Bankr. D. Idaho 2001). An action under Section 523(a), to the inclusion of Section 523(a)(9), must be proven by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 289, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Under bankruptcy law, the unlawful operation of a motor vehicle while intoxicated is determined by substantive state law. *In re Barnes,* 266 B.R. 397, 402-03 (B.A.P. 8th Cir. 2001) (citing *Whitson v. Middleton (In re Middleton),* 898 F.2d 950, 952 (4th Cir. 1990)). There is no requirement that the debtor be criminally convicted of unlawful operation of a motor vehicle. *In re Pair,* 264 B.R. at 684. Under Missouri law, a person unlawfully operates a motor vehicle if that individual drives a motor vehicle while in an intoxicated or drugged condition. Mo. Rev. Stat. § 577.010.1 (2011). "A person is in an 'intoxicated condition' when he is under the influence of alcohol, a controlled substance, or drug, or any combination thereof." Mo. Rev. Stat. § 577.001.3 (2011). A person is under the influence of alcohol when "his use of alcohol impairs his ability to operate an automobile." *State v. Schroeder,* 330 S.W.3d 468, 475 (Mo. 2011) (citations omitted).

Missouri Statute Section 577.037.5 states:

> Any charge alleging a violation of section 577.010 or 577.012 or any county or municipal ordinance prohibiting driving while intoxicated or driving under the influence of alcohol shall be dismissed with prejudice if a chemical analysis of the defendant's breath, blood, saliva, or urine performed in accordance with sections 577.020 to 577.041 and rules promulgated thereunder by the state department of health and senior services demonstrate that there was less than eight-hundredths of one percent of alcohol in the defendant's blood unless one or more of the following considerations cause the court to find a dismissal unwarranted:
>
> (1) There is evidence that the chemical analysis is unreliable as evidence of the defendant's intoxication at the time of the alleged violation due to the lapse of time between the alleged violation and the obtaining of the specimen;

15

(2) There is evidence that the defendant was under the influence of a controlled substance, or drug, or a combination of either or both with or without alcohol; or

(3) There is substantial evidence of intoxication from physical observations of witnesses or admissions of the defendant.

Mo. Rev. Stat. § 577.037.5 (2011).

The actual measure of the defendant's blood alcohol content is not required to establish that defendant was driving while intoxicated. *State v. Adams,* 163 S.W.3d 35, 37 (Mo. App. 2005). "In the absence of a chemical analysis showing a defendant's blood alcohol content, the State may meet its burden of proof solely through the testimony of a witness who had a reasonable opportunity to observe the defendant." *State v. Rose,* 86 S.W.3d 90, 105 (Mo. App. 2002); *State v. Edwards,* 280 S.W.3d 184, 189 (Mo. App. 2009) ("Intoxication may be proven by any witness who had a reasonable opportunity to observe Defendant's physical condition."). The Court must therefore determine whether the evidence is sufficient to find guilt of intoxication beyond a reasonable doubt. *See State v. Seitz,* 384 S.W.3d 384, 387 (Mo. App. 2012) (citing *State v. Belton,* 153 S.W.3d 307, 309 (Mo. 2005)).

Missouri appellate courts typically affirm a trial court's determination of intoxication if "there was sufficient evidence from which reasonable persons could have found the defendant guilty of the charged offenses." *Edwards,* 280 S.W. 3d at 189 (citation omitted). "When reviewing the sufficiency of the evidence, we review all evidence and inferences reasonably draw[n] from the evidence in the light most favorable to the verdict and disregard all contrary evidence and inferences." *State v. Burse,* 231 S.W.3d 247, 251 (Mo. App. 2007) (citations omitted) (where Missouri Court of Appeals discusses the standard of review on appeal).

"Although the bankruptcy court must apply state law to resolve the substantive issues under section 523(a)(9), the Federal Rules of Evidence apply in all proceedings under the Bankruptcy Code, including adversary proceedings." *In re Barnes,* 266 B.R. at 403; Fed. R. Bankr. P. 9017

16

(2011); Fed. R. Evid. 1101(a) (2011). "Thus, even when the bankruptcy court applies state law to resolve substantive issues, it must apply the Federal Rules of Evidence to resolve evidentiary questions." *In re Barnes,* 266 B.R. at 403 (citing *Hirsch v. Lopreato (In re Colonial Realty Co.),* 209 B.R. 819, 822 (Bankr. D. Conn. 1997)); see also *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112 (8th Cir. 1985) (general questions of admissibility of evidence are governed by federal law in cases where state substantive law applies).

Plaintiffs have brought forth two bases for this Court to determine that Defendant was intoxicated when he struck the riding lawnmower that was operated by Decedent. First, Plaintiffs argue that there is sufficient evidence to determine that Defendant was under the influence of the drug Lexipro, which, in combination with a high quantity of alcohol, is sufficient for this Court to determine that Defendant was intoxicated under Missouri Statute Section 577.037.5(2). Defendant admits that at the time of the incident which ultimately caused the death of Decedent, Defendant held a prescription for Lexipro, an anti-depressant medication which should not be taken while driving and should not be combined with alcohol.[53]  Nonetheless, there is no evidence that Defendant took Lexipro on the date of the crash, June 13, 2010, and as such, there is no evidence that Defendant was under the influence of Lexipro at the time Defendant struck Decedent with the SUV. As a result, the Court concludes that Plaintiffs have not met their burden pursuant to Missouri Statue Section 577.037.5(2).

Plaintiffs' second argument is that there is substantial evidence of intoxication from physical observations of witnesses or admissions of the defendant as required by Missouri Statute Section 577.037.5(3). As such, Plaintiffs argue that this Court should conclude that Defendant was intoxicated at the time he struck Decedent with his SUV and any debt owed by Defendant to Plaintiffs for the wrongful death of Decedent should be excepted from discharge pursuant to Section

---

[53]Pl. Ex. 31.

523(a)(9).

The Court has combed through the record in this case. There is not a single witness that has stated, or testified during a deposition or before this Court, that they observed Defendant in an intoxicated state on June 13, 2010. Not surprisingly, Ms. Bagley stated that she did not believe Defendant to be intoxicated while they were together. So too, Ms. Gleeson testified that Defendant appeared normal while she spoke to him outside Dos Arcos after Defendant had struck Decedent. Abigail, Defendant's daughter, testified that her father appeared normal to her and she did not detect an odor of alcohol while he was at her home dropping off her laptop. Finally, Ms. Lottinville stated that she did not smell any alcohol on Defendant's breath when he visited her the night of June 13, 2010.

The Court is also presented with Defendant's admission that he consumed one 32 ounce free-poured double rum and coke, as well as almost half of a small single rum and coke. No evidence was presented on how many ounces are in the small alcoholic drink at Dos Arcos. Even if this Court were to conclude that while a large alcoholic drink contains 32 ounces, a small alcoholic drink at Dos Arcos contains eight (8) ounces, this would lead the Court to reasonably conclude that Defendant consumed at least 36 ounces of free-poured rum and coke within approximately two and a half (2.5) hours. Plaintiffs argue that this is the amount of five (5) ordinary-sized alcoholic beverages and this Court accepts this characterization.

Further, the Court is presented with Defendant's "Not sure...Drunk & sad" text message which was sent to Ms. Gleeson at approximately 8:34 p.m. on June 13, 2010, and Defendant's "Very hung over my friend ... Not gonna make it ... Very sorry" text message which was sent allegedly to Mr. Garcia at approximately 6:24 a.m. on June 14, 2010.

The above is also coupled with Defendant's DWI experience as an attorney in Missouri, having handled between 50 and 100 DWI cases over the course of his legal career. Defendant knows the standard of proof for DWI cases in Missouri, to the inclusion of the importance of a

18

chemical analysis of any DWI suspect and the need for witnesses of intoxication.  There is no dispute that Defendant did not stop at the scene of the crash and that a chemical analysis was not conducted.  To circumvent the lack of a chemical analysis, Plaintiffs presented the testimony of several witnesses who saw Defendant hit the riding lawnmower that was operated by Decedent, heard a loud crash and saw Defendant drive away without stopping at the scene.

What does this all mean?  What can this Court reasonably conclude?  It means that at 8:34 p.m. on June 13, 2010, Defendant likely felt drunk and sad, despite his rather ridiculous testimony that this text message was intended to repel Ms. Gleeson's advances.  As such, this Court can merely conclude that it is possible that this text message means that at 8:34 p.m., almost one hour before the relevant time – 9:30 p.m., when Defendant actually struck Decedent – Defendant may have been drunk and sad.  It means that at approximately 6:34 a.m. on June 14, 2010, Defendant may have been hung over.  Despite Defendant's possible hangover, Defendant was able to bring the SUV to Pearl Motor Company to repair the damage approximately one hour after the "Very hung over my friend ... Not gonna make it ... Very sorry" text message was sent in that Defendant brought the SUV to the Pearl Motor Company between 7:30 and 8:00 a.m.  Again, this says little about whether Defendant was actually intoxicated at approximately 9:30 p.m. on June 13, 2010.  And as for the witnesses at the scene, at best, these individuals were witnesses to Defendant's recklessness while he was driving and Defendant leaving the scene of a motor vehicle accident.

Defendant arrived at Dos Arcos at approximately 6:30 p.m. and left shortly after 9:09 p.m. – a period of over 2.5 hours.  At that time, Defendant, weighing over 260 lbs, consumed some food and at least 36 ounces of free-poured rum and coke.  It is unknown when during that 2.5 hour period Defendant consumed those beverages in that it is unknown if Defendant passively drank throughout the time at the restaurant or if he consumed the majority of the drinks within minutes of leaving Dos Arcos and getting into his SUV.  None of this is known, and frankly, none of these facts will ever be known.  Is the evidence presented by Plaintiffs sufficient for this Court to subjectively

19

determine that based on the totality of circumstances, Defendant was intoxicated at approximately 9:30 p.m. when he struck Decedent? Simply put, yes; however, that is not the standard under the relevant Missouri statute.  Alas, of all that has been presented, what is missing is the what is needed: substantial evidence of intoxication from physical observations of witnesses or admissions of the defendant *at the relevant time – around 9:30 p.m. on June 13, 2010.*  The Court concludes that Plaintiffs have not met their burden pursuant to Missouri Statute Section 577.037.5 (3) and as such, any debt for the wrongful death of Decedent will not be excepted from discharge pursuant to Section 523(a)(9).

Section 523(a)(6)

Debts arising from wilful and malicious injury by a debtor are excepted from discharge under Section 523(a)(6). 11 U.S.C. § 523(a)(6) (2011).  Wilfulness and maliciousness are two distinct elements of Section 523(a)(6).  *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008) (citing *In re Scarborough,* 171 F.3d 638, 641(8th Cir. 1999), *cert. denied,* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999)).  The Eighth Circuit Court of Appeals has set a high bar for certainty of harm regarding wilful and maliciousness for the purposes of Section 523(a)(6).  *In re Adams*, 349 B.R. 199, 203 (Bankr. W.D. Mo. 2006) (citing *In re Hartley,* 869 F.2d 394 (8th Cir. 1989) (citations omitted)).  To prove wilfulness, the creditor must show by a preponderance of the evidence that debtor intended the injury, not just a deliberate or intentional act leading to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *Grogan v. Garner,* 498 U.S. 279, 280, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991).  Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6). *Kawaauhau,* 523 U.S. at 64, 118 S.Ct. at 978.  "If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences." *In re Patch,* 526 F.3d at 1180.

"In cases under section 523(a)(6), the prevailing view holds that debts arising from

20

drunk-driving liability are dischargeable absent a showing that the debtor acted with intent to inflict injury." *Cassidy v. Minihan,* 794 F.2d 340, 343 (8th Cir. 1986). "Section 523(a)(6) excepts from discharge intentional injuries, not liability resulting from intentional acts which lead to injury," thus, liability caused by drunk-driving are not per se excepted from discharge. *In re Compos,* 768 F.2d 1155, 1158 (10th Cir. 1985); *In re Hostetler,* 44 B.R. 886, 888 (M.D. Fla. 1984).

At the outset, the standard for maliciousness has not been met by Plaintiffs in that there is no evidence that Defendant specifically intended any harm to Decedent. There is no evidence that Defendant even knew Decedent. Decedent was simply in the wrong place at the wrong time and it ultimately cost him his life. As such, this Court has no choice but to conclude that any debt for the wrongful death of Decedent will not be excepted from discharge under Section 523(a)(6).

Decedent may not have been a model citizen. Nevertheless, he leaves behind his daughter Ashley who will never have her father to walk her down the aisle when she gets married and his son Matthew who will forever be deprived of the advice of his father. Decedent also leaves behind his wife Marci  who will be denied of Decedent's companionship for the rest of her life. Decedent's mother, Gemma bore the unnatural burden of laying her son to rest. Additionally, the remaining members of Decedent family have also suffered this awful loss. Plaintiffs' recourse against Defendant henceforth will be through the criminal justice system and the Court sincerely hopes that in that, Plaintiffs will find some solace.

By separate Order, judgment will entered accordingly.

_Kathy A. Surratt - States_

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED:  October 15, 2013
St. Louis, Missouri 63102

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Scott L. Kolker
7730 Carondelete, Suite 310
St. Louis, MO 63105

Fredrich J. Cruse
The Cruse Law Firm
718 Broadway
PO Box 914
Hannibal, MO 63401-0914

Howard S. Smotkin
Stone, Leyton & Gershman
A Professional Corporation
7733 Forsyth Boulevard, Suite 500
St. Louis, MO 63105

James Arthur Clampitt
PO Box 987
Mexico, MO 65265